CAROZZA CORPORATION *v.* SILVER HILL SAND AND GRAVEL CO.

[No. 113, October Term, 1946.]

*Decided May 14, 1947.*

The cause was argued before DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*A. David Gomborov,* with whom were *Eugene M. Carozza* and *Sasscer & Digges* on the brief, for the appellant.

*Julius A. Victor, Jr.,* with whom were *George T. Burroughs* and *Edward J. Brannan* on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court for Prince George's County, in equity, entered Septem-

ber 10, 1946, in a suit by the Carozza Corporation, for discovery and accounting of sand and gravel mined from premises known as the Indurated Concrete Corporation, Abbott and Clifton properties in Prince George's County, which was before this Court on demurrer in *Silver Hill Sand & Gravel Co. v. Carozza Corporation,* 184 Md. 226, 40 A. 2d 311. The bill alleged that the defendant agreed to pay the complainant a royalty of 6 cents a ton for all material mined from said properties, and to account monthly therefor, but that no account had been rendered subsequent to January 1, 1942. After remand, the defendant answered, admitting that the Silver Hill Company was a partnership, composed of Samuel Bevard and Robert J. Cremen, until the latter's death on April 16, 1943, and since July 1, 1943, composed of Samuel Bevard and Mary E. Cremen, the widow of Robert J. Cremen. The answer admitted that the former partnership agreed to pay 6 cents a ton for material mined from the Indurated Concrete Corporation and Abbott properties, and that the defendant was indebted to the complainant at that rate for the period January 1, 1942, to June 28, 1942, but denied that it agreed to pay 6 cents a ton with respect to the material mined from the Clifton property. The answer further alleged that the complainant and the defendant each owned certain machinery and equipment, making up a washing plant which the defendant operated on the Indurated Concrete Corporation property, but because of certain receivership proceedings against the landowners and a court injunction, they were compelled to vacate those premises within 30 days from May 28, 1942. The defendant obtained an option for a lease on the Clifton property, and on July 15, 1942, entered into a lease for five years, with a right of renewal for an additional five years, upon a royalty agreement of 5 cents a ton for material mined, with a minimum royalty of $1,000 a year. The answer further alleged that the defendant agreed to pay the Carozza Corporation 3 cents a ton for the use of its equipment, which the defendant moved, at its own ex-

pense, to the new location. The bill and answer thus put in issue the rate per ton of the material mined from the Clifton property. The case came on for hearing before the Chancellor in May, 1945. After extensive testimony had ben taken, and the case submitted, the Chancellor found that the agreement was for 3 cents a ton, and entered a decree for an accounting on that basis.

There seems to be no dispute that the Carozza Corporation owned and operated a plant mining sand and gravel on the Indurated Concrete property as early as 1934. In 1939, the Silver Hill Company set up a portable washing plant at the same location, using the water and electric power facilities that had been installed by the Carozza Corporation. In August, 1941, the Silver Hill Company decided to discontinue operations and move their equipment out, but, at the request of Frank Carozza, agreed to remain and turn out material for the Carozza Corporation, using the Carozza equipment as well as their own. Under this arrangement, the Silver Hill Company paid the Carozza Corporation 12 cents a ton, out of which the latter paid 6 cents a ton to the landowners. When the court ordered the removal of the plant on or before June 28, 1942, Frank Carozza, vice-president of the Carozza Corporation, testified that Cremen told him that Bevard had found a suitable new location, and on or about May 30, 1942, Carozza went to look it over. Bevard testified that Carozza told him on that occasion "you can move whatever stuff I have got over at * * * the Indurated Concrete Corporation, over here; if you want it, you can have it for the use and 3 cents a ton," and "I told him that sounded right good to me."

Frank Carozza denied making any such proposition; he testified that he discussed the question of price with Cremen at Glen Burnie, a few days later. Because the proposed lease called for 5 cents a ton to the landowners, he asked Cremen 7 cents; Cremen demurred, and he then offered to take 6½ cents, or to pay one-third the cost of moving the plant and take a one-third interest in the new operation. Cremen told him that he

didn't want any more partners, but would pay him 6 cents. This statement was corroborated by the witness Brill, who was present at that conversation. Later, when the minimum royalty clause in the proposed lease was brought up, Carozza offered to guarantee one-half the payment, but this offer was declined. The lessor's attorney advised against having Carozza a party to the lease. Some months later, Cremen told him that Bevard objected to paying 6 cents, only wanted to pay 2 cents, and Carozza told him "if you won't pay me the 6 cents, pay me $30,000, and I will get out altogether." Cremen said he would talk to his partner and give him an answer. This conversation was corroborated by Frank A. Carozza, the secretary and treasurer of the corporation, except that he stated that the sum of $20,000 was mentioned. Cremen died shortly afterwards.

Carozza testified he never had any discussion of price with Bevard, until after Cremen's death. At a conference in Carozza's office in August, 1943, with Bevard and Brannan, the administrator *c. t. a.* of Robert J. Cremen, Bevard claimed the agreement was for 3 cents. Carozza said: "You fellows can fight it out, at 6 cents or $30,000, that was my agreement with Bob, or one-third part."

Edward J. Brannan testified that on two occasions, in 1943, Carozza admitted that he had put a proposition to Cremen of "one-third partner or six cents," but that Cremen "did not answer."

There was also a flat contradiction as to the duration of the agreement. Carozza's version was that it was to last as long as the lease, or until the sand and gravel was exhausted. Bevard's version was that no time was ever specified. On this point the Chancellor found that the agreement was to continue for the duration of the Clifton lease. Carozza testified there was enough material, according to his estimate, to last five years; Bevard testified, without contradiction, that the material would be completely exhausted by June, 1945. On November 6, 1944, Bevard, through his attorney, wrote Carozza

that he had discontinued use of the Carozza equipment, and requested its removal in 15 days. Carozza replied that he was insisting on compliance with the agreement.

There was also considerable testimony as to the nature of the equipment moved to the new location, to which party it belonged, its value, and the cost of relocating the plant. Bevard testified that after they began operations in 1939 the Silver Hill Company had to make a number of replacements to the old plant to keep it in operation, and that they supplied a new steel bin for a worn-out wooden one, hauling trucks and most of the movable equipment. At the new location, Silver Hill supplied a dam for water power, the electric power line, gasoline power shovels and cranes. They did not move the Carozza steam shovel to the new location, but junked it. They took about 500 feet of wire from the old location to the new, but bought 3,000 feet of new wire to install the electric hook-up. He testified that they used, of the Carozza equipment, a cylinder screen, five electric motors (11 years old), a pair of sand drags, one feeder bin, another 30-ton bin, some pumps of an obsolete type and a number of small items, all of which he valued at some $2,700. The cost of relocating the plant was about $7,500. Silver Hill "had the bulk of the equipment that could be moved that was worth anything." Of course, they could not move the dam or power line installed at the old location. Since moving to the new location they have completely replaced the old Carozza equipment.

In rebuttal, Frank A. Carozza put a value of about $16,000 on the equipment belonging to the Corozza Corporation that was moved. He stated that Silver Hill was still using some of their equipment, and denied that Silver Hill could have replaced it in 1942, because of the war and the priority situation. Recalled to the stand, Bevard produced bills to show that he had purchased the electric wire, and many of the items mentioned, and had obtained the necessary priorities.

The issue presented is largely one of veracity. The appellant argues the improbability that Carozza, Senior,

would have made an agreement with Bevard, the operating man, when all of his other dealings were with Cremen, and that he would have been willing to accept less at the new location than he was getting at the old. He also argues that the equipment was extremely scarce and valuable, on account of the war shortages and demand. On the other hand, the appellee points to the urgent necessity that the equipment be moved in compliance with the court's order, and argues that it had only a junk value unless put into operation elsewhere, as a complete unit. The appellee denies that the items belonging to the Carozza corporation were of any great value or impossible to procure.

There is room for a contention that the parties never actually reached an agreement as to the rate per ton. It is certainly remarkable that if an agreement was reached either as to 6 cents or 3 cents, neither party took the trouble to write a letter confirming the verbal understanding, neither party took inventory of the equipment in question, and such important considerations as the obligation to replace worn-out parts, the cost of relocating the plant, and even the duration of the agreement, were left in the air.

In the absence of any agreement as to repairs it would seem that Silver Hill, as the bailee for hire, would be liable for ordinary repairs, but not for extraordinary repairs or replacements, in accordance with the accepted rule. 8 *C. J. S. Bailments,* Sec. 24, page 257; 6 *Am. Jur.,* Sec. 204; note 129 *A. L. R.* 461. In the absence of any agreement as to the rate, it might be argued that the defendant would be liable on a *quantum meruit* basis, or perhaps on the basis of the former rate. Compare *Fast Bearing Co. v. Koppers Co.,* 181 Md. 203, 29 A. 2d 289, 144 A. L. R. 1022.

However, both parties, in their briefs, state the sole question to be whether the Chancellor erred in finding that the agreement was for a 3-cent rate instead of a 6-cent rate. Both parties conceive the issue to be solely one of fact, and cite no authorities. In

this state of the record, we are constrained to accept the findings of the Chancellor, who saw and heard the witnesses in an extended hearing where the testimony covered a much wider range than is indicated by the appendices. He was in a position to pass upon their credibility. We think the chancellor was clearly correct in finding that the complainant did not meet the burden of establishing a final and binding agreement on the basis of a 6-cent rate, and while the testimony as to the 3-cent rate is not wholly convincing, we think the fact that the defendant assumed the whole cost of relocating the plant and the sole liability under the new lease, and the fact that the Carozza Corporation had spent no money on replacements since 1939 (if, indeed, it had made any replacements since 1934), tend to support a rate lower than that paid at the old location. We are inclined to accept the appellee's contention that the Carozza equipment was a minor factor in the new enterprise and had little or no intrinsic value. As between a 6-cent rate and a 3-cent rate, we think the weight of the evidence, in the light of the emergency confronting the parties in 1942, supports the finding of the Chancellor.

*Decree affirmed, with costs.*